-++

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ISIAC NICHOLAS RENTERIA,

                Petitioner,

    v.

BEN CURRY, Warden

                Respondent.

_____/

1:08-cv-01209-AWI-DLB (HC)

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

[Doc. 18]

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Following a jury trial in the Tulare County Superior Court, Petitioner was convicted of robbery with use of a handgun. Cal. Penal Code §§ 211, 12022.53(b). (CT 317.) On December 12, 2005, Petitioner was sentenced to 14 years in state prison. (CT 661-663.)

Petitioner filed a timely notice of appeal. On March 28, 2007, the California Court of Appeal, Fifth Appellate District affirmed the conviction and sentence. (Lodged Doc. No. 4.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on June 27, 2007. (Lodged Doc. Nos. 17 & 18.)

Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on February 25, 2009. (Lodged Doc. Nos. 15 & 16.)

Petitioner filed the instant federal petition for writ of habeas corpus on August 18, 2008,

1

1   which was stayed and held in abeyance to allow him to return to state court to exhaust his

2   unexhausted claims.  (Court Docs. 1 & 9.)

3        On March 10, 2009, Petitioner filed an amended petition and motion to lift the stay.

4   (Court Docs. 16 & 18.)

5        On March 18, 2009, the Court vacated the stay and directed Respondent to file a response

6   to the amended petition.

7        Respondent filed an answer to the amended petition on June 16, 2009, and Petitioner filed

8   a traverse on July 8, 2009.  (Court Docs. 28, 30, 31.)

9                         STATEMENT OF FACTS[1]

10       At 7:00 p.m. on December 13, 2004, school bus driver William Catterall was
     walking home from the Fairway Market on Tulare Street in Visalia. When he
11   reached the corner, he heard someone behind him say, "[H]ey, man, hey, man,
     hey, man ... I want your wallet." Catterall turned around and saw a man draw a
12   small gun from his side and point it at him with both hands. "I believe it was a .25
     caliber, perhaps a .32, chrome, one of those little automatics." Although it was
13   dark, Catterall said he could see because there was a streetlight behind his right
     shoulder. Catterall said he saw a second man across the street. He then came
14   across the street. At first, Catterall thought he was a bystander seeking to help
     him. However, the second man stood next to the first and pointed a larger gun "...
15   probably a Glock or a military .45" at Catterall.

16       Mr. Catterall put his grocery bag down and threw his wallet on the ground
     between the two men. The second man opened the wallet, removed $413 in cash,
17   and dumped the contents of the wallet on the ground. Catterall asked them to
     leave his license so he could still drive his school bus. Catterall said, "[H]ey man
18   ... do me a favor.... [Y]ou know, leave the license and stuff 'cause I'm-you know,
     can't drive no more and stuff...." Catterall said the first man appeared nervous.
19   The first man picked up a final bill on the ground and said, "[T]hank you for your
     cooperation." The assailants then ran away.

20
     Mr. Catterall called 911 on his cell phone and gave a description of the two
21   assailants. Visalia police officers arrived at the scene while Catterall was still on
     the phone. Detective Paul Esquibel contacted Catterall and conducted a field
22   interview. Catterall went to the police station that evening for a second interview.
     At the station, Catterall gave a statement about what had happened and a
23   description of the people who had robbed him. Catterall said he could not identify
     the second robber. However, Catterall described the first assailant as 18 to 21
24   years of age, between five-foot six inches and five-foot eight inches in height, and
     150 to 160 pounds. He said the first assailant had light complexion, a narrow,
25   pointed nose, thin mustache, and acne or scarring on his cheekbones. The first
     robber also had a faint mustache, as if he had not shaved very well. According to

26

27   _____

     [1] The Court finds the Court of Appeal correctly summarized the facts in its March 28, 2007 opinion.
28   (Lodged Doc. No. 4.)  Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth
     Appellate District.

                                    2

Catterall, the first assailant was dressed in a dark, hooded sweatshirt and had the hood pulled up over his head. Catterall told officers he thought he could identify the first suspect if he was wearing similar clothing and had a hood pulled over his head.

On December 16, 2004, Detective Paul Esquibel compiled a photographic lineup based on Catterall's description. He placed appellant's picture in position number 3 because another officer told him that appellant lived in the area of the crime. However, a subsequent investigation revealed that appellant did not live at an address in the area. Appellant was 24 years old, five-feet eight inches tall, weighed 140 pounds, and had a broader nose, clear cheeks, and no mustache. Three days after he gave a statement to police, Catterall went back to the police station and met with Detective Esquibel in an attempt to identify the robbers.

Detective Esquibel showed Mr. Catterall a number of photographs on a computer. These photos were compiled from "JALAN," a system containing photographs of people previously booked into Tulare County Jail. Catterall failed to identify anyone from the JALAN system photographs. Esquibel then showed Catterall a "six-pack" photographic lineup that he had prepared. Catterall immediately pointed to appellant's photograph in position number 3 and identified appellant as the first robber. Based on Catterall's identification, Detective Esquibel secured a warrant and arrested appellant on December 27, 2004. Appellant was wearing a dark gray, hooded sweatshirt, black pants, and white tennis shoes at the time of his arrest.

Jamie Parker was dating appellant at the time of the crime. While in custody, appellant wrote several letters to Parker. One of the letters outlined a detailed scenario of events for Parker and her friend, Lauren, to follow. The letter included details as to what each person should say upon questioning. The letter described the clothes the trio wore on the evening of the crime, the times they arrived at and departed from Lauren's home, and the statement that Parker took appellant straight to his grandfather's home after departing Lauren's home. Appellant's letter advised Parker: "Make sure this story is air tight so that way I can hurry up and go home to you." He also advised: "Just keep your answer simple but if they do want detail you have it."

Defense

Appellant's mother, Yvonne Renteria, testified she saw appellant at least every other day in December 2004 because he lived one street away from her. Yvonne testified she had never seen appellant with a moustache, although he usually wore a goatee.

Scott Fraser, Ph.D., a professor of neurophysiology and psychology, testified about eyewitness memory processes and the effect of lighting on eyewitness identification. Dr. Fraser said lighting affects an individual's ability to detect boundaries, edges, and color. He also said as light gets dim, the eye moves to "photopic vision." As a result, the eye tries to compensate by dilating the pupil to admit more light. As the eye dilates, the distance at which an individual can focus-called the depth of field-gets shorter and shorter. He explained:

> "So what the eye does is compensate, but it only can do so at the cost of the objects have to be much closer. What you can see at 20 feet, as light gets dimmer and dimmer and has to now be at 18, 12, 5, 8 inches depending upon how dim the light gets."

3

Dr. Fraser said he personally looked at the scene of the robbery. He testified that the streetlights had low pressure sodium vapor lamps that give off a golden yellowish glow. Such lamps draw very little electricity but, according to Dr. Fraser, are not very good lights in terms of illumination. Because such a lamp gives off a "goldish, tan, peach glow," rather than a white glow, everything gets distorted in its colors. He said individuals have a less accurate color perception while under such lamps.

At the time of the offense, the sun had set, moonlight would not have been visible, and the only source of illumination would have come from artificial sources. Dr. Fraser said "scatter lights" from vehicle headlights would have bounced off of various objects and added some illumination to the scene. Based on William Catterall's description of the scene, Dr. Fraser said the dominant light source came from behind the robbers. In his opinion, the robbers were back lit, their faces cast their own shadows forward, and their features were masked. He explained in that situation "what you can see normally at 20 feet is now going to have to be two to two and a half feet away to see the same kind of details...."

Dr. Fraser also testified about "weapons focus" and a witness's observations of a suspect when there is a weapon involved in an incident. He explained:

> "When the weapon is present or presumed to be present such [that] the person says don't move, I have a gun, they have their hand underneath their jacket, two things occur. One is the weapon is a distractor. It commands our attention. We look down at it, so in the total observation time, there's less time to focus on the face.
>
> "The second is it's a stressor. It increases arousal, fear and the rest, and high stress interferes with the actual processing of information."

He also said when more than one individual in the scene is being viewed, the ability to recognize any single person is decreased. According to Dr. Fraser, this is known as the "multiple targets effect."

Dr. Fraser also talked about "distinctive cues." He said this term refers to "any kind of feature of the person that's odd, unique, strange, different that distinguishes that person from others." Such cues include scars, tattoos, facial hair, unusual hairstyles, and behavioral manifestations like a lisp, stutter, or limp. According to Fraser, such cues result in the most accurate identifications. As to the accuracy of facial recognition, Dr. Fraser explained:

> "... We're hardwired into that [facial recognition] to do it very well, but by the same token, that's why it's so easily disrupted when the conditions are not adequate for making a clear observation such as lighting, distance, depth of field, stress, weapons focus, those things are very disruptive, and they're understandably more disruptive with a hardwired system than one that's more flexible, but we're very good at it under the right conditions...."

(Lodged Doc. No. 4, Opinion, at 6-10.)

1

DISCUSSION

2   A.   <u>Jurisdiction</u>

3        Relief by way of a petition for writ of habeas corpus extends to a person in custody

4 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

6 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7 violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8 out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

9 28 U.S.C. § 2254(a); 2241(d).

10       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12 enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114

13 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

14 <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

15 1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059

16 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17 petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18   B.   <u>Standard of Review</u>

19       Where a petitioner files his federal habeas petition after the effective date of the Anti-

20 Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

21 the state court's adjudication of his claim:

22         (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
23         Court of the United States; or

24         (2) resulted in a decision that was based on an unreasonable determination of the
            facts in light of the evidence presented in the State court proceeding.
25

26 28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

27 contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

28 materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown</u>

1  v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

2  (2000).  A state court decision will involve an "unreasonable application of" federal law only if it

3  is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti,

4  537 U.S. 19, 24-25 (2002) (per curiam).  "A federal habeas court may not issue the writ simply

5  because that court concludes in its independent judgment that the relevant state-court decision

6  applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations

7  omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

8         "Factual determinations by state courts are presumed correct absent clear and convincing

9  evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

10  and based on a factual determination will not be overturned on factual grounds unless objectively

11  unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

12  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

13  apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v.

14  Blodgett, 393 F.3d 943, 976-77 (2004).

15         Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501

16  U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

17  provided no reasoned decision, courts conduct "an independent review of the record . . . to

18  determine whether the state court [was objectively unreasonable] in its application of controlling

19  federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

20  independently review the record, we still defer to the state court's ultimate decisions." Pirtle v.

21  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

22  C.    Impermissibly Suggestive Photographic Lineup

23         Petitioner contends that the photographic lineup was impermissibly suggestive.

24  Petitioner contends that he was the only potential suspect depicted in the photographic lineup

25  with a dark hooded sweatshirt-as described by the victim in this case.

26         1.    *Background of Claim*

27         The appellate court thoroughly summarized the background of the photographic lineup

28  and stated the following:

Immediately after the robbery, William Catterall called the police on his cellular phone and gave a description of the suspect.  He said one of the robbers was about 18 to 21 years old, had a lighter complexion was between five-feet six inches and five-feet eight inches tall, weighed between 150 to 160 pounds, had dark colored eyes, and had a thin moustache.  Catterall also said the suspect possibly had acne on the cheeks, had a long lean face with a narrow nose bridge, wore a hooded sweatshirt with the hood over his head, and wore sweat pants.  Catterall said the suspect carried a small chrome gun.  That same day, he told Detective Esquibel he could identify the person "if he saw him again with a hood over his head and if he was wearing similar clothing."

Mr. Catterall met with Detective Esquibel on December 16, 2004, three days after the crime occurred.  Esquibel showed Catterall a series of photographs on the JALAN computer program.  That program compiles photographs of jail inmates according to requested physical traits.  Catterall viewed the number of JALAN photographs but could not identify anyone.  Esquibel then had Catterall read and sign an admonishment that he was in no way obligated to identify anyone.  After Catterall signed the admonishment, Esquibel showed him a six-picture photographic lineup.  Catterall immediately pointed to appellant's photograph in position number 3 and indicated that he "was the individual" who had robbed him.  Esquibel then asked Catterall to note on the bottom of the lineup form the reasons for his identification.  Catterall wrote:

"Looking at photos - #3 has several features that are what I believe the assa[il]ant had - - the nose area is correct - same as the eye spacing and depth, and dark eyes - - the chin profile is the same - minus the mustache that the person had"

At the January 28, 2005, preliminary hearing, Mr. Catterall identified appellant as the first robber.  Catterall testified at one point:

[T]here's a little detail, little more puffy today than what there was, but it looked like a little more gaunt, a little more lean, but judging from the time frame and lack of stress, this is the person I see because I'm also seeing the chin, I'm looking at the nose, I'm looking at the bridge of the nose, forehead, there's enough hair right here.  I'm looking at the same person.

(Lodged Doc. No. 4, Opinion, at 10-11.)

On May 18, 2005, Petitioner moved to suppress the victim's identification on the following grounds: (1) the lineup was not created based on the victim's identification, but rather on the police officer's unsubstantiated hunch who then hand picked other victims that looked similar to Petitioner; (2) Petitioner was the only potential suspect depicted in the photographic lineup with a dark hooded sweatshirt-as described by the victim in this case; (3) the victim did not explicitly pick the photograph of Petitioner as the suspect but merely noted the similarities

and differences between Petitioner and the person who robbed him; and (4) by placing the only

suspect (Petitioner) in a jail outfit before the victim, after indicating the suspect was under arrest,

and then asking him to identify the sole person sitting at the defense table, persuaded the victim

to identify Petitioner.

> On May 18, 2005, the court conducted a contested hearing on appellant's motion to suppress. The court "acknowledged that [Petitioner] was the only person depicted in the lineup in a hooded sweatshirt. The court also noted that [Petitioner's] photograph did not evidence a narrow nose or a long face. In addition, the court observed that Mr. Catterall did not identify number 3 as a picture of a robber. Rather, Catterall selected photograph number 3 and then made comments about that picture. The court also observed that [Petitioner] had clear skin with no scars or acne."

(Id.; Opinion, at 12.)

After considering all the evidence, the trial court denied the suppression motion, finding:

> I've considered the evidence in the case, and there is certainly some validity to a concern that the type of clothing worn by the individual in number 3 may be somewhat suggestive; however, that is not the standard.

> "The law is that to be excluded, the court must consider the totality of the circumstances and must find that the photograph procedure was so impermissibly suggestive and unduly suggestive to give rise to a substantial likelihood of misidentification, and ... I cannot and do not come to that conclusion given, again, the totality of the circumstances."

(Id.)

## 2. *Last Reasoned Decision of Appellate Court*

After discussing the applicable law, the Fifth District Court of Appeal, held:

> William Catterall testified that, as a bus driver, he had received special training in dealing with robberies and highjacking. He said, "[J]ust stay focused, get reference points, you know, heights, I mean, get something you can measure by, notice the voice, notice the hands, movement, I mean, just notice the smallest detail and basically ignore what you can't really describe ...." Catterall said he focused on the features of the assailant he could clearly see - - the hands and the face.

> At the preliminary hearing, Mr. Catterall said he was almost 100 percent certain of his identification from the photo lineup. Catterall testified at trial he nevertheless went through a process of elimination and sought ways to validate his identification because "there would be no way that I would say okay, this person did it if I didn't believe it." Catterall said at the preliminary hearing he saw appellant walk in the courtroom and Catterall "could tell it was the body movement" of the first robber. Catterall also attempted to look at appellant's hands because the first robber had "[s]kinny fingers, smaller hands" than the second robber, who had "short, stubby, meaty hands." According to Catterall,

during the preliminary hearing, appellant "did a double-take cause there were only two people in the courtroom, and he did a double-take and recognized me." Catterall said that double-take confirmed his identification "far above a reasonable doubt."

The foregoing facts and circumstances do not reflect a substantial likelihood of irreparable misidentification under the totality of the circumstances. William Catterall, a professional bus driver, had received special training in coping with robberies and highjacking. He immediately identified appellant from a six-person photographic lineup. Although appellant's photograph depicted a certain kind of attire, Catterall said "[i]n the scheme of things, clothes meant nothing" because they were generic and he was focusing on the first robber's faces, hands, movements, and voice. Appellant's double-take just prior to the preliminary hearing, combined with Catterall's identification based upon factors other than the hooded sweatshirt, demonstrated that Catterall's description was reliable under the totality of the circumstances.

The trial court did not err in denying appellant's motion to suppress the pretrial identification from the photographic lineup.

(Lodged Doc. No. 4; Opinion, at 16-18.)

    3.    *Analysis of Claim*

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). The court reviews the totality of the circumstances surrounding the challenged procedure for improper suggestiveness. United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985). If the court concludes that the procedure was not impermissibly suggestive, the inquiry ends. Id. However, if the court concludes otherwise, it must determine whether the identification was nevertheless reliable under the totality of the circumstances. Id.

In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, the court considers (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time

between the offense and the identification.  Manson v. Brathwaite, 432 U.S. 98, 104-107, 114 (1977); Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

> The defendant bears the burden of demonstrating the existence of an unreliable identification procedure. [Citations.] "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." [Citation.]  ¶ Moreover, there must be a "substantial likelihood of irreparable misidentification" under the "' "totality of the circumstances"'" to warrant reversal of a conviction on this ground.

Manson v. Brathwaite, 432 U.S. at 104-107; see also Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

State findings concerning the factors outlined by the Supreme Court in Neil v. Biggers are considered factual and must therefore be granted a presumption of correctness.  28 U.S.C. § 2254(e)(1); see Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986); Sumner v. Mata, 445 U.S. 591, 592 (1981).  However, the ultimate question of constitutionality of pretrial identification procedures is a mixed question of fact and law, and hence is not governed by the presumption. Sumner, 449 U.S. at 597.  "[T]he federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard.  But the questions of fact that underlie this ultimate conclusion are governed by the statutory presumption. . . ." Id.  (emphasis in original).

Under the AEDPA, a determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard at issue.  Indeed, "[a]pplying a general standard to a specific case can demand a substantial element of judgment," Yarborough v. Alvarado, 541 U.S. 652, 664 (2004), whereas a standard defined with exacting specificity can be applied almost mechanically.  Therefore, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Id.

In the instant petition, Petitioner contends that the identification was unnecessarily suggestive because (1) his driver's license photo was used in lieu of his jail booking photo; (2) he was the only person in the photo lineup wearing a hooded sweatshirt; (3) the angle of Petitioner "in the photo is such that his head is tilted backward, chin jutting out, which gives a skewed view of the facial features" unlike the other depictions; (4) the DMV photograph was smaller than the

other photographs.  (Petition, Memorandum of Points and Authorities, at 12-13.)  Petitioner also

argues that the victim's identification was not reliable because it was dark during the crime, the

gun was pointed at him from six to eight feet away, the suspect was at an angle to the street light,

and the suspect was wearing a hood.  In support of his claim, Petitioner contends that the

victim's description contrasts with his identify because he was described as a male adult with a

light complexion, thin mustache, possible acne on cheeks, and no whiskers on his chin, whereas

Petitioner, is a Hispanic male, no mustache, no acne on his checks, and had significant hair on

his chin at that time.  (Id. at 14.)

As previously stated, the six-person photographic lineup was taken from an extensive

data base.  The photos were selected by computer from photographs of similar looking

individuals based on a certain criteria including race, height, weight, etc.  There is no

constitutional requirement that all of the photographs in the lineup be nearly identical.  See Van

Tran v. Lindsey, 212 F.3d 1143, 1156-1157 (9th Cir. 2000), disagreed with on other grounds in

Lockyer v. Andrade, 538 U.S. 63, 71 (2003).  Petitioner simply has not demonstrated that the

state appellate court's determination that the line up was not impermissibly suggestive was

unreasonable.  The fact that Petitioner's photo was slightly smaller in size than the others did not

make the lineup overly suggestive such that Petitioner stood out and was more likely to be

selected.  In addition, the fact that Petitioner was the only suspect in the line-up wearing a

hooded sweatshirt was likewise not unduly suggestive given that two other suspects had high

collared shirts and the hood was not covering his head to draw such dramatic attention to it**.**

Indeed, Catterall testified that given his training and ability to observe Petitioner the fact that he

was wearing a hooded sweatshirt had little impact on his identification.  Catterall's attention was

likely focused on the person pointing the gun at him during the robbery and he was unequivocal

in his identification of Petitioner.  All of the suspects in the line-up have similar facial

characteristics and contain the same background setting.  (CT 211.)  In sum, the Court of Appeal

reasonably determined that Catterall's description was reliable under the totality of the

circumstances including: Catterall's preliminary hearing testimony of near certainty of

identification from the photo lineup, his special training in observations while dealing with

11

robberies and hijackings, his statement that the clothes had little meaning in the scheme of things, and Petitioner's double-take just prior to the preliminary hearing, independent of the Catterall's identification of the hooded sweatshirt.  The appellate court properly considered the totality of the circumstances, and concluded that the facts and circumstances did not demonstrate a substantial likelihood of irreparable misidentification.  Such finding is presumed to be correct.  Sumner, 449 U.S. at 596.  Accordingly, Petitioner has failed to demonstrate that the California Court of Appeal's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

D.    Exclusion of Evidence of Third-Party Culpability

Petitioner contends that the trial court denied his constitutional right to present evidence of third party culpability.  More specifically, Petitioner contends the trial court erred by denying his request to admit "evidence of similar robberies with the same modus operandi, in the same general area, and where the assailant fit the description of the victim in the case at bar." (Petition, at 5.)

1.    *Factual Background of Claim*

On May 19, 2005, Petitioner filed an in limine motion to admit evidence of third party culpability.  As stated by the Court of Appeal, Petitioner alleged in pertinent part:

> On December 29, 2004, at 8:30 pm at night, Juan Valencia had just left R & N Market in Visalia when he was robbed at gun point in the parking lot. One of the suspects (suspect 1) came out of a vehicle while the other waited inside. Suspect 1 pulled a gun from his sweatshirt. The gun was a semi-automatic handgun. He told Mr. Valencia to give him his wallet or he'd kill him. After giving him the wallet, Suspect 1 got back into his car and left with suspect two.
>
> "The two suspects drove out onto Lover's Lane, and then drove westbound on Tulare Avenue.
>
> "Mr. Valencia describes the suspects as:
>
> "Suspect 1: Hispanic Male in his early 20s. Black pullover sweatshirt. 5' 6″. 145 pounds. The hood of his sweatshirt was over his head. He was carrying a semi-automatic handgun.

"Suspect 2: White Male in his mid 30s. Beard and fu man chu moustache. 170 pounds. Brown hair. Driver of vehicle.

"In the present case, Mr. Catterrall was robbed while walking out of Fairway Market on Tulare Street, which is not far from where this robbery took place. In our case, both robbers ran down Tulare Street and left the area before police could respond, making it probable that they had a vehicle parked close by. The description of suspect 1 in our case (which the people allege to be Isaic [ *sic* ] Renteria) is virtually identical to that of the suspect who robbed Mr. Valencia. [¶] Isaic [ *sic* ] Renteria was in custody on December 29, 2004, and could not have committed the robbery at the R & N Market."

(Lodged Doc. No. 4, Opinion, at 19.)

The district attorney filed an opposition arguing that the evidence provided only a possible motive or opportunity to some third party is insufficient to raise a reasonable doubt of guilt. It was further argued that there was no direct or circumstantial evidence linking the third party to the robbery against Petitioner.

On May 20, 2005, the trial court denied the motion, stating:

"All right. I've considered the requirements of *Hall* cited in the People's brief particularly, as well as the proposition that marginal evidence is insufficient to trigger admissibility under Hall.

"As I said, I made a chart as to each case. Mr. Kaelble [deputy district attorney] mentioned most of what I have noted, and I think it's necessary that I state what I have noted.

"The instant case, we have first man on foot with a handgun, that's a chrome gun, automatic. I note that there's some dissimilarity between the approach. 'I want your wallet' in this case to 'I want your wallet or I'm going to kill you' in the second. I don't attach great significance to that.

"Here, of course, the second man was on foot. In the other case, the second man stayed in the car.

"The defense claims that ... each scene is in the same general geographic areas. It depends upon what your definition of the same geographical area. I've shopped in both those stores. I grew up in this community. I know where they're located, and in my mind, they're significant distance from each other.

"I would say one is on the edge of town and the other is as noted, more in the central area of the community.

"The defense attached some significance to the fact that in this case, the people

13

ran down Tulare. Well, they were on Tulare when the incident happened. In the other, it's a vehicle-insofar as approaching the other way, and the other car drove south down what is referred to as Lovers Lane and then west on Tulare. West-Tulare I think is about two intersections south of R and N Market.... It's just down the road, but ... if you're walking, it's a ways.

"... I note that there is some similarity between the descriptions of the main perpetrator, if you will, in each case, but there are many individuals in our world, and certainly in our community, that can be described as a light-complected male, five six to five eight weighing 150 to 160 pounds or five six, 145 pounds. Each wore a black sweat shirt, but gee, you just walk down the street, and at that time of the year, many people are wearing dark sweat shirts.

"We have the chrome gun in this case, and in the other case, which has been described as an automatic, in this case chrome gun, automatic; other case semiautomatic, black gun. As noted, the second individual involved in each case is ... undoubtedly a different person.

"While there may be some arguable similarity between the two events, it's again marginal at best, and it will not be allowed.... [I]t will not meet the standard of third party culpability."

(Id. at 20-21.)

    2.   *State Court Decision*

In finding Petitioner's claim to be without merit, the California Court of Appeal[2] analyzed the relevant constitutional law and held, in pertinent part, as follows:

    [¶] In the instant case, appellant moved in limine to admit evidence relating to a duo of assailants who robbed one Juan Valencia on the evening of December 29, 2004, approximately two weeks after the robbery of William Catterall. However, nothing in that proffered evidence established a direct or circumstantial evidentiary link between the robbers of Valencia and the robbers of Catterall. Moreover, unlike the factual scenario in *Holmes*, the instant case does not entail an "arbitrary" rule. Rather, the trial court properly cited and applied a well-established rule regulating the admission of evidence proffered by a criminal defendant to show that someone else committed the crime with which appellant was charged. The petition in *Holmes* did not challenge the validity of such rules and the United States Supreme Court expressly observed that "[s]uch rules are widely accepted." (*Holmes*, *supra*, 126 S.Ct. at p. 1733.) In our view, no evidentiary error occurred in the instant case.

    Assuming arguendo error, the judgment shall not be set aside by reason of the erroneous admission of evidence unless (a) there appears of record a timely objection to or a motion to exclude the evidence, and (b) the court which passes upon the effect of the error or errors is of the opinion that the admitted evidence

---

[2] Because the California Supreme Court issued a summary denial, this Court looks through that decision to the last reasoned decision by the Court of Appeal. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

should have been excluded on the ground stated and the error or errors complained of resulted in a miscarriage of justice. (Evid.Code, § 353.) A miscarriage of justice should be declared only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable a result more favorable to the appealing party would have been reached absent the error. ( *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170.)

William Catterall testified the lighting conditions on Tulare Street on the evening of the robbery enabled him to see the first robber and that both robbers stood about eight feet from him. As a school bus driver, Catterall had taken a special course to identify robbers and highjackers based on specific features, including voice, body movements, and mannerisms. Catterall first identified appellant based on his photograph in a six-picture lineup and confirmed that identification based on appellant's movement in the preliminary hearing courtroom and appellant's expression of surprise upon seeing Catterall in that courtroom. Catterall said his identification was "far and above a reasonable doubt."

Jamie Parker, a woman who dated appellant at the time of the crime, testified she received several letters from appellant while he was in custody on the charges. Parker said appellant's letters described a detailed alibi that appellant wanted her and her friend, Lauren, to adopt for the evening of the crime. Parker said she did not believe she was with appellant on the evening of the robbery. She could not recall that specific evening or some of the details to which appellant alluded in his letter, such as her attire that evening or the movie they may have seen that evening. Parker's impression of the letter was "[t]hat he [appellant] wanted me to be his alibi." The letter stated in pertinent part:

"... Make sure this story is air tight so that way I can hurry up and go home to you.... [¶] ... [¶]

"... When he questions you don't have to go into detail. I just went into detail so if they do try to trick you or Lauren or me we will all have the same answers. Your [sic] heard me!! Just keep your answer simple but if they do want detail you have it.

"Let me express to both of you how grateful and appreciative I am of this. I owe both of you in a major way when I get out *what ever* you ask I will make it happen or die trying for I am forever indebted to you two."

Appellant's letter to Parker included a scenario for the evening of the offense as well as specific wardrobe items for Parker, Lauren, and himself.

In addition to the testimony of Mr. Catterall and Ms. Parker, the jury received as evidence the pictures from the photographic lineup and the text of the letter appellant wrote to Parker while he was in custody on the charges. Catterall testified he was 100 percent certain that appellant was one of the robbers. Parker's testimony about the alibi letter provided circumstantial evidence of appellant's guilt.

Arrayed against this prosecution evidence, appellant sought to show that one Juan Valencia was robbed by a pair of assailants two weeks after the robbery of Mr. Catterall. The robbery occurred outside the R & N Market in Visalia rather than the Fairway Market. One of the assailants emerged from a vehicle rather than approaching Valencia on foot. That assailant was a Hispanic male in his early

20's. He was dressed in a black pullover sweatshirt and had the hood of the sweatshirt drawn over his head. He stood five feet six inches tall, weighed 145 pounds, and pulled a semi-automatic handgun from his sweatshirt. The driver of the vehicle was a white male in his mid-30's. He had a beard and "fu man chu" moustache, brown hair, and weighed 170 pounds.

Appellant asserted the R & N Market was in proximity to the Fairway Market and the description of the first suspect in appellant's case was "virtually identical" to the gun-bearing assailant in the Valencia case. The superior court, while acknowledging some "arguable similarity" between the two events, considered the two grocery stores a "significant distance from each other." In the Catterall robbery, the two assailants initially absconded on foot. In the Valencia robbery, the two assailants arrived and departed in a vehicle. While the first assailant in each case wore a black sweatshirt, the court did not deem that significant given the time of year, i.e., December. The court noted the description of the second assailant in the Catterall robbery was different than the description of the second assailant in the Valencia robbery. The court concluded the second individual in the Valencia case was "undoubtedly a different person."

In view of the foregoing facts and circumstances, it is not reasonably probable a result more favorable to the appellant would have occurred had the court admitted the proffered evidence of third-party culpability.

(Lodged Doc. No. 4, Opinion, at 24-27.) (Emphasis in original)

3.   *Analysis of Claim*

Respondent initially argues that because this claim involves a state law ruling only, habeas relief is unavailable.  To the extent Petitioner's claim is based on a state law violation, Respondent is correct.

An evidentiary ruling, based on state law, may not be set aside in a federal habeas corpus proceeding unless it "render[ed] the state proceedings so fundamentally unfair as to violate due process." Spivey v. Rocha, 194 F.3d 971, 977-978 (9th cir. 1999); see also Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).  Thus, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  Criminal defendants have a fundamental due process right, implicit in the Sixth Amendment, to present a defense. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); see also Crane v.

1   Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).  However, that right is not

2   unlimited. Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir.2002).  A state law justification for

3   exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it

4   is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." United

5   States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); Crane, 476 U.S.

6   at 689-91 (discussing the tension between the discretion of state courts to exclude evidence at

7   trial and the federal constitutional right to "present a complete defense").

8       The Court of Appeals for the Ninth Circuit has determined that where the proffered

9   evidence simply affords a possible ground of suspicion pointing to a third party and does not

10  directly connect that person with the actual commission of the offense, that evidence may be

11  excluded.  See People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing

12  Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983)).  Under California law, a criminal

13  defendant has a right to present evidence of third party culpability if it is capable of raising a

14  reasonable doubt regarding his own guilt.  See Spivey, 194 F.3d at 978 (citing People v. Hall, 41

15  Cal.3d 826, 833 (1986)).  For admission of third party culpability evidence, "there must be direct

16  or circumstantial evidence linking the third person to the actual perpetration of the crime."  Hall,

17  41 Cal.3d at 833.  Motive or opportunity is not enough.  Id.

18      While there are some arguable similarities between the two robberies, that in and of itself

19  is insufficient to render Petitioner's trial fundamentally unfair and a denial of due process.  As

20  fully discussed by the California Court of Appeal, Petitioner failed to present evidence to

21  establish a direct or circumstantial link between the robbers of Valencia and the robbers of

22  Catterall.  Rather, any possible connection between the robberies was based on pure speculation

23  and was therefore insufficient under California law to connect the third party directly to

24  Catterall's robbery.  Therefore, the trial court's decision to exclude this evidence was not

25  arbitrary or disproportionate and did not result in a denial of due process.  See Spivey v. Rocha,

26  194 F.3d at 978.  Accordingly, the state courts' determination of this issue was not contrary to, or

27  an unreasonable application of, clearly established Supreme Court precedent.

28

1    E.    <u>Ineffective Assistance of Counsel</u>

2        Petitioner contends that trial counsel's performance was ineffective because he (1)

3    prevented him from testifying at trial; (2) persuaded him to reject a three-year plea offer

4    promising a not guilty verdict, and (3) failed to object to the prosecution's impeachment evidence

5    of Petitioner's expert witness, Dr. Fraser.  The Court will address each claim separately.

6        The law governing ineffective assistance of counsel claims is clearly established for the

7    purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Canales v. Roe</u>,

8    151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

9    assistance of counsel, the court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S.

10   668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First,

11   the petitioner must show that counsel's performance was deficient, requiring a showing that

12   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

13   the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's

14   representation fell below an objective standard of reasonableness, and must identify counsel's

15   alleged acts or omissions that were not the result of reasonable professional judgment

16   considering the circumstances. <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348

17   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

18   a strong presumption that counsel's conduct falls within the wide range of reasonable

19   professional assistance.  <u>Strickland</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Sanders v.</u>

20   <u>Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

21       Second, the petitioner must show that counsel's errors were so egregious as to deprive

22   defendant of a fair trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688.  The court must

23   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

24   ineffectiveness.  <u>Id</u>.; <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356,

25   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

26   was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

27   (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

28   have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

    1.   Advice Regarding Petitioner's Testimony

Petitioner raised this claim to the trial court by way of Marsden motion to relieve counsel and raised the issue in chambers without counsel present.

> THE DEFENDANT: Another thing was that I told him I wanted to get on the stand; that I wanted to testify, and I'm not used to talking to a judge.  I mean, I came in when I was 18 years old and I tried to talk to one of the judges, and he yelled at me don't ever talk to him.  If I want to talk, say to my lawyer.  So I'd had that in my mind to not talk to you guys directly, through them, though, and that's why I never spoke up and said anything like directly to you . . . I mean, I though I had a right to get on the stand and tell the jury my side of the story and - he wasn't having - he wasn't seeing it . . . And I tried to tell him I wanted to get on the stand, and he still said no.  I mean, we argued for like two, three minutes right - right here about me wanting to get on the stand, and then that's when you guys - we were done resting, and he said yeah.

(MHRT 482-483.)  The court continued the matter for three weeks to allow counsel to appear. (Id. at 486.)

At the subsequent hearing, the following exchange took place:

> THE COURT: [Petitioner], what didn't Mr. Ogas [defense counsel] do?

> [PETITIONER]: I wanted to get on the stand.  He didn't want me to get on the stand.

> THE COURT: Oh yes.  All right.  So it's your allegation that you wanted to get on the witness stand and Mr. Ogas wouldn't let you.

> [PETITIONER]: Yes.

> THE COURT: Mr. Ogas?

> MR. OGAS: That's not true.  He never expressed that to me.  I discussed it with him that he could take that option.  I advised him I didn't think it would be a good idea.  Based on the facts, it wouldn't help us in the case, but I didn't prohibit him from taking the stand, and he ultimately decided not to take the stand.

THE COURT: All right.  As I recall, [Petitioner], you also - is there anything else you want to say about not taking the stand?

[PETITIONER]: I wanted to take the stand and he said no, it's not a good idea, I don't want to do it, and that's when you said is that all, and then that was it. He never said it's your - it's your decision, your anything.  He just took it in his hands and said no, I don't think it's a good idea, and that's it.

THE COURT: What did you say to him, if anything, when he said I don't think it's a good idea?

[PETITIONER]: I didn't get to say nothing.  That's when you asked if there was any - any other witnesses he was going to call, and he said no.  That was it.  I expressed numerous times that I wanted to take the stand.

MR. OGAS: And my response, he did not express numerous times that he wanted to take the stand, that's not true.  He may have asked me about a couple of times being curious about what if I took the stand.  I told him I didn't think it would be a good idea, but I expressed to him he has that right.

I'm not a very pushy individual.  I didn't force him not to testify.  I communicated to him his options and told him my advice which was don't take the stand.  It's not gonna help us in this case.  He made the choice ultimately, and we went on.  I thought we had witnesses we called.  The case went forward . . . I would not force him not to take the stand.  That's not my style or my - the way I handle clients.  If he wanted to, even it if was against his interest, I'd let him.  So the claim that I did not let him take the stand is not true.

(MHRT 490-492, 498-499.)

Petitioner raised this claim first in the trial court-the only court to issue a decision. Therefore, "[b]ecause the trial court's view was the 'last reasoned decision' by the state court on the issue of prejudice, we owe it deference."  See e.g. Hirschfield v. Payne, 420 F.3d 922, 928 (9th Cir. 2005) (applying § 2254(d)(1) to trial court Faretta ruling).  This Court's review is limited the state court's decision, not its reasoning, for determination under the "unreasonable application" clause.  Merced v. McGrath, 426 F.3d 1076, 1081 (9th Cir. 2005).

A criminal defendant has a fundamental right to testify on his own behalf.  See Rock v. Arkansas, 483 U.S. 44, 51-53 (1987).  However, a counsel's strong advice against testifying does not preclude the exercise of that right.  In this instance, Petitioner admits that at the time of trial he was fully aware of his constitutional right to testify but claims trial counsel would not allow him to do so.  The record refutes Petitioner's claim.  The trial court implicitly rejected Petitioner's claim that counsel prevented him from testifying.  Petitioner has failed to present

1   sufficient evidence to overcome the presumption of correctness attached to the trial court's

2   determination.  See 28 U.S.C. § 2254(e).

3          At the Marsden hearing, trial counsel testified that it was his opinion that it would not be

4   a good idea for Petitioner to take the stand because it did not help his case.  However, counsel

5   was clear that he expressed to Petitioner his right to testify if he so desired.  Counsel indicated

6   that Petitioner did not express to him numerous times that he desired to take the stand; rather,

7   Petitioner expressed curiosity a couple of times about whether to take the stand.  Counsel advised

8   Petitioner why he felt it would not be a good idea.  Petitioner never voiced a desire to testify

9   contrary to counsel's advice and effective waived his right.  See United States v. Edwards, 897

10  F.2d 445, 446-447 (9th Cir. 1990) (holding that a defendant who silently abided by his counsel's

11  decision not to call him as a witness may not later be a basis to set aside his conviction by

12  claiming he was deprived of his right to testify).  Moreover, nothing in the record supports

13  Petitioner's claim that he argued with counsel for several minutes about taking the stand prior to

14  defense counsel resting such that he was prevented from responding to counsel or altering the

15  court.  (See RT 374-378.)

16         Furthermore, at the time of the hearing Petitioner did not indicate exactly what his

17  testimony would have been, as he simply stated that he wanted to tell "the jury [his] side of the

18  story."  (MHRT 482.)  However, now to this Court, he contends he would have testified "that he

19  was making a lot of money at the time the robbery occurred and therefore he had no reason to rob

20  a man returning from the store with groceries.  Petitioner's testimony would have eliminated any

21  motive propagated by the prosecution."  (Amd. Petition, at 19-20.)  It is highly unlikely that

22  Petitioner's self-serving and incriminating testimony that he was a successful drug dealer and had

23  no motive to rob another individual would have led to a different outcome.  Had counsel

24  considered Petitioner's purported testimony, coupled with his prior felony record, it is certainly

25  reasonable to anticipate a cross-examination that would have certainly cast doubt on Petitioner's

26  testimony.  Under these circumstances, counsel's strong opinion advising Petitioner against

27  taking the stand, and Petitioner's apparent decision to follow counsel's advise, was not a denial

28  of his right to testify.  Petitioner's disagreement with counsel's trial tactics is not a basis for

1   demonstrating ineffective assistance.  See United States v. Mayo, 646 F.2d 369, 375 (9th Cir.

2   1981).

3          The state court's denial of this claim strong supports that, given the contradictory

4   statements and self-serving nature of the claim, the court found counsel more credible than

5   Petitioner.  See Weaver v. Palmateer, 455 F.3d 958, 964 (9th Cir. 2007).  Federal courts may

6   "properly assume that the state trier of fact applied correct standards of federal law to the facts,"

7   absent indicia of unreliability.  Towsend v. Sain, 372 U.S. 293, 315 (1963).  There is no indicia

8   of unreliability here, and the state courts' determination of this issue was not contrary to, or an

9   unreasonable application of, clearly established Supreme Court precedent.  Furthermore,

10  Petitioner simply cannot demonstrate prejudice in light of the evidence against him and the

11  prejudicial cross-examination he would have likely been subject to.

12          2.      Advice To Reject Plea Offer

13         At the Marsden hearing prior to sentencing, Petitioner also claimed that trial counsel

14  persuaded him to reject the three-year plea offer by promising a not guilty verdict at trial.

15  Petitioner stated:

16              First thing was I'd told him that I wanted to take the deal; that I didn't
        really want to - - I didn't have a good feeling about it, and he kinda persuaded me
17      to going to trial; that they didn't have no evidence.  There's no way they'd find me
        guilty, trust him, trust him.
18
            The second day [of] trial, I told him if there's any way he can see if the
19      deal's still on the table because I don't like the way this feels, and he told me you
        don't - - again, you don't trust me?  Trust me, I'll have you home in a couple days,
20      don't worry about it.  This is an easy case, I'm winning, just - - I can ask him
        about the deal, but trust me, I'll be home in a couple days.
21          . . . .

22              I'm not guilty or nothing like that.  It's just 14 years is a long time, and I
        didn't want to have that - I didn't want to have the jurors have my future in their
23      hand, you know what I mean, my destination.  Three years I already been in
        prison.  I kinda knew that my background would look bad, but I got three boys.  I
24      didn't want to risk being away 14 years compared to three years, and, I mean, he
        sold me - he sold me a good story that he could beat it, don't worry about it.
25      There's no evidence.  There's no way they're going to convict you.

26
27  (MHRT 481, 483.)  At the subsequent hearing, the following exchange took place between the

28

1    parties.

2    THE COURT: All right.  What are your other complaints, Mr. Renteria?

3    [PETITIONER]: The deal, I wanted to take the deal and felt like I was persuaded into taking it to trial; that we had a for sure, for sure win.

4    THE COURT: All right.  Were you persuaded or forced?

5
6    [PETITIONER]: I don't know, I can't – I don't – more like just pushed into you can beat it; you can beat it; you can be home pretty soon.

7    I wanted to take the deal.  No it's – we can beat it.  There's no evidence.  I beat cases like this before with more evidence against you.  They don't have no
8    evidence against you.  We can beat it.  All right then.

9    And then we went – we had opening arguments that day or opening statement, and the next day, I told him that I didn't like the trial, that I wanted to
10   take the deal and if he could see if the deal was still on the table, and he said I could but I'm not going to, and we're already started, so we're just going to go
11   with it.

12   THE COURT: All right.  I'm having a little bit of trouble understanding what you said.  Were you told that I had indicated if you pled prior to trial that it
13   would be - - believe I said two years; I believe that was - -

14   MR. OGAS: I think it was three, but we were trying to get two.  Ralph said he wouldn't object to two, but there was problems with getting the mitigated
15   sentence.  So it was - - pretty much, it was three, but we couldn't get two, bottom line.

16
17   THE COURT: I see.  Did you communicate, Mr. Ogas, to Mr. Renteria in a timely fashion the court's indicated?

18   MR. OGAS: Yes, I did.  He also had the same offer, three years, at pretrial which he rejected.  We spent a lot of time before trial, I think the court
19   remembers, trying to get - discuss the offers, trying to get last-minute settlement, and he and I met in the jail cell and talked about it, three years, and he ultimately –
20   I think he wanted one, and the court was three, and we were trying to get Ralph to do two, and it didn't work.  He ultimately didn't take the offer, we went to trial,
21   and Ralph was very clear to me that his offer was good up until trial.  He wouldn't extend it once we selected a jury.

22   THE COURT: What was his offer?

23
24   MR. OGAS: His offer was to drop the special allegations and just make it a robbery which is why it was a three-year indicated.

25   THE COURT: I see.  Did Mr. Renteria every say he would take the deal?

26
27   MR. OGAS: He said he would take one year, and we were trying to get Ralph to agree to two.  Ralph said he wouldn't object to two, but your indicated was three.

28

THE COURT: All right.

MR. OGAS:  And so we were trying to fudge around with numbers, and it never worked out.

THE COURT: All right.  So by Ralph, you're indicating Mr. Kaelble.

MR. OGAS: Ralph Kaelble, yes.

THE COURT: All right.  What about the next day after jury selection:

MR. OGAS: Once the trial had started, there was moments – I think it was two days where he asked me again about the deal.  I told him that we couldn't take it.  It's done.  We can't get it, I told him, and then I went on, told him look, we have a good trial.

I was trying to get his spirits back up after that, but it was clear to me from what Mr. Kaelble said, deal was up until trial.  We had the jury.  We were doing the trial.  I couldn't – he wasn't going to offer it to me in the middle of trial, and he made that clear to me.

. . . .

With regards to the deal, I tried to work a deal out with him on several occasions, and even before this trial started we tried to work something out.  Ultimately, he didn't want to take that.

He did ask me what I thought his chances were.  I told him I though he had a good case.  I was frank with him.  I told him, of course, we could lose this case, you know.  This is three years as opposed to 14 years, but ultimately, he decided that he wanted to go to trial, and I respected that wish, and we went to trial.  I did not keep him from taking that deal.  That's ridiculous to say that.

(MHRT 492-495, 499.)  As to this complaint, the trial court specifically stated for the record:

if I didn't make it clear, I believe the attorneys know that insofar as any indicateds that I give, that's prior to trial.  Once the trial starts, we're going to trial unless there's something that happens.  There's always the exception, but that - - that is, of course, the practice that once the trial starts, unless there is some disruption of the evidence or unforeseen circumstance that arises, the trial proceeds and the court's indicated is no longer on the table.

(MHRT 495.)  Again, the trial court denied the motion.  (MHRT 500.)

As with the preceding claim, Petitioner raised this claim first in the trial court-the only court to articulate a decision.  Therefore, the trial court's decision is the last reasoned decision by the state court deserving of deference.  Hirschfield v. Payne, 420 F.3d at 928.

"[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer."  United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992) (citing Hill v. Lockhart, 474

U.S. 52, 56-57 (1985) (holding that voluntariness of a guilty plea depends on the adequacy of counsel's legal advice)).

In the instant case, Petitioner does not contend that counsel failed to inform him of the plea offer.  Nor does he allege that counsel affirmatively misled him about the law.  Rather, Petitioner contends counsel persuaded him to reject the plea offer promising an acquittal at trial.

Petitioner's self-serving statement is insufficient to establish that, but for counsel's advice, there is a reasonable probability that he would have accepted the plea.  "Self-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions."  See United States v. Allen, 153 F.3d 1037, 1041 (9th Cir. 1998) (citing Cuppett v. Duckworth, 8 F.3d 1132, 1139 (7th Cir. 1993 (en banc).

Even considering Petitioner's and counsel's explanations at face value, it is undisputed that Petitioner was informed of his maximum exposure and of the plea offer.  The fact that counsel and Petitioner chose to proceed to trial based on counsel's defense strategy and sincere belief that there was insufficient evidence to convict does not rise to the level of incompetence under Strickland.

3.    Failure To Object To Impeachment Evidence

Petitioner contends trial counsel rendered ineffective assistance by failing to object to the prosecution's impeachment of defense expert witness, Dr. Fraser.  (Amd. Petition at 21.)

The prosecution elicited testimony from Dr. Fraser that on a previous occasion he lied under oath; however, the Attorney General's officer did not charge him with perjury.  The incident involved testimony made under oath by Dr. Fraser to a superior court judge that he believed the prosecution called him in an attempt to intimate him.  The superior judge reviewed the transcripts and found that be untrue.

Petitioner raised a motion for new trial, and new-appointed defense counsel argued that Petitioner's trial counsel was ineffective by failing to object to the prosecutor's line of questioning during cross-examination.  The trial court agreed that defense counsel was ineffective but did not find any resulting prejudice, stating:

25

Well, Mr. Hiddleston [newly-appointed defense counsel], I am inclined to find that counsel did fail to act in a manner reasonably expected - or expected of reasonably competent counsel by not objecting to that.  There should have been an objection.  I would have sustained it.  [¶] . . . [¶]

I have made mention of the issue relating to Mr. Fraser's experience and matter in Los Angeles County.  In the final analysis as to that issue, I do find that counsel should have objected to the references relating to that proceeding, the judge's comments, the judge's actions and so forth, but the defense has failed to demonstrate that it is reasonably probable that a more favorable result would have been attained in the absence of counsel's failure to object, and I find that made no difference in the trial, and the defense simply has not met its burden.  So its contentions relating to counsel's failure to object at trial are . . . without merit, do not come close to meeting the standard required, so the motion's denied as to that particular issue.

(RT 587, 597-598.)

Petitioner contends the trial court correctly found ineffective assistance of trial counsel but incorrectly determined there was no resulting prejudice.  The last reasoned decision of the California Court of Appeal rejected this claim stating:

In the instant case, the trial court concluded: "The trier of fact was not left with the suggestion that there was ever a prosecution for perjury, much less a conviction."  The court's conclusion was well-taken.  During his trial testimony, Dr. Fraser testified as to his background and credentials with respect to eyewitness memory processes, lighting and illumination, and neurophysiology.  He carefully explained to the jurors the scientific methodology he employed in evaluating whether William Catterall could have been able to identify the first assailant during the robbery.  Although the prosecution cross-examined Dr. Fraser about alleged perjury in the unrelated "Noriega" case, defense counsel had ample opportunity to question Dr. Fraser on redirect examination in order to rehabilitate his credibility as a witness.  During that redirect examination, Dr. Fraser emphasized he had never been charged with perjury and had never been charged with anything in his life.
. . . .

In view of this finding, we cannot say that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  The trial court did not err in denying appellant's new trial motion on the grounds of ineffective assistance of counsel during the cross-examination of defense expert Scott Fraser.

(Lodged Doc. No. 4, Opinion, at 36.)

Petitioner has failed to demonstrate that the California Court of Appeal's finding of no resulting prejudice was contrary to Strickland, 466 U.S. at 687.  This is certainly so given Catterall's unequivocal testimony and Petitioner's failed attempt to fabricate a detailed alibi, and

there is not a reasonable probability that had counsel objected it would have resulted in a more

favorable outcome.  Petitioner's claim fails on the merits.

F.     Denial of Motion For New Trial

Petitioner contends the trial court erred in denying his new trial motion based on newly

discovered evidence that Robert Mendoza committed the robbery.  (Amd. Petition at 27.)

Petitioner presented this claim to the trial court prior to sentencing, on direct appeal to the state

appellate court, in his petition for review, and in his collateral petition to the California Supreme

Court.

On October 25, 2005, Petitioner filed a motion to compel discovery of exculpatory

evidence and, on November 3, 2005, a motion for new trial on the ground that Robert Vincent

Mendoza had confessed to the crime for which Petitioner was convicted.  On November 8, 2005,

the trial court granted Petitioner's motion for discovery of the exculpatory evidence.  On

November 28, 2005, the trial court held a hearing and Robert Mendoza testified about the

robbery he claimed to have committed on December 13, 2005-of which Petitioner was convicted.

(See RT 596-601.)  It was noted that the victim had died after the trial and prior to this hearing.

After listening to Mendoza's testimony, ordering and reviewing supplemental briefing, and

argument by counsel, the trial court denied the motion.

The last reasoned decision of the California Court of Appeal rejected the claim, in

relevant part, as follows:

> In the instant case, respondent acknowledges that Robert Mendoza's
> testimony generally corroborated William Catterall's testimony as to the essential
> details of the robbery.  Each man testified the robbery was committed on the
> evening of December 13, 2004, the crime was committed with a chrome gun,
> there were two robbers, that the first robber wore a dark hooded sweatshirt, had
> acne on his face, had a small moustache, and that about $400 had been taken from
> Catterall's wallet.

> However, there are significant differences between version of events
> offered by Mendoza, the purported first robber, and that of William Catterall, the
> victim of the robbery.  Mendoza said he pointed his weapon "sideways" at
> Catterall.  Catterall said the assailant's weapon "was out in front of me" and
> described the assailant's placement of the weapon using gestures.  With the
> approval of the prosecutor, defense counsel characterized those gestures in the
> following manner: "I think he's moving where he's pointing at the ground near his
> right foot.  He's moving it slowly till it's pointing at a 90-degree angle in front of
> him."

Mendoza said he had an armed companion during the robbery. However, he could not recall the companion's name. He first said the companion held a .45-caliber weapon and then changed his story and said the companion held a .38-caliber weapon. Mendoza said he approached Mr. Catterall from the back and that his companion stood behind Mendoza. In contrast, Catterall said the second robber was across the street and Catterall could see him over the first robber's right shoulder. When the second robber crossed over, Catterall saw him holding "a big gun, probably a Glock or a military .45." Catterall said he never walked on the sidewalk. Mendoza said the robbery occurred on the sidewalk.

Mr. Catterall said he set down his bag from the Fairway Market, got his wallet, and "chucked it on the ground between the two people." According to Catterall, the second robber opened the wallet, dumped the contents on the ground, and took the money. Catterall said a single bill remained on the ground and the first robbery picked it up, said "thank you for your cooperation," and then both robbers ran away. In contrast, Mendoza said his friend grabbed the wallet from the ground, took the money, a couple of pictures, and a phone address book, and threw the wallet back down. Mendoza said he never touched the wallet or took anything. Mendoza also claimed he never said anything to Catterall aside from "hey, man" and "give me your wallet."

Catterall testified, "[A]fter I put ... the wallet on the ground, I said hey man, I says, do me a favor. I said leave – you know, take the money, leave the ... license and stuff 'cause I'm ... you know, can't drive no more and stuff ...." Mendoza said he knew Catterall drove a school bus for a living but could not explain how he acquired such information. Mendoza was also unable to remember the side of the street that Catterall was walking on, the nature of the area of the robbery site, and the name of his companion. Mendoza said he normally wore red, the color of the Nortenos street gang, but did not do so during this robbery.

According to [Petitioner's] October 25, 2005, motion to compel discovery of exculpatory evidence, Mendoza was "currently pending charges or robbery on several other cases." [Petitioner's] counsel attached police reports for those various cases. According to those reports, Mendoza typically robbed commercial establishments, dressed in red clothing (including the shirt, shoelaces, and bandana) to indicate he was a Norteno member, and used a black 9-millimeter handgun to commit the offense. During a July 27, 2005, robbery he told the victim, "'Give me the fuckin' money.'" This was unlike the robbery of William Catterall in which the first robbery politely said, "thank you for your cooperation." Although Mendoza had a variety of visible tattoos, Mr. Catterall did not mention any tattoos to law enforcement officers.

Finally, Mendoza admitted that he talked about the offense a "[l]ittle bit" with [Petitioner] Renteria at the Bob Wiley Detention Facility. Although Mendoza said he was not [Petitioner's] cellmate, they were both housed in unit 42 and Mendoza referred to [Petitioner] as his "homie," meaning associate or friend. [Petitioner] also admitted he was facing a string of other robberies.

In our view, it is not reasonably probable a consideration of both the old and new evidence would have led to a different result. As the superior court noted at the new trial hearing, Robert Mendoza was not credible with respect to the aiming of the firearm, the location of the robbery, the location of the fellow robber, and the handling of William Catterall's wallet. The court specifically noted that Mendoza behaved in a burly manner on the witness stand and that such

1    behavior was inconsistent with the relatively polite behavior of the first assailant
2    who robbed Catterall.  The court noted Mendoza had an opportunity to
     communicate with his fellow inmate, [Petitioner].  Moreover, the court noted
3    Mendoza had a motive to fabricate testimony about the Catterall robbery, based
     on a gang affiliation he shared with [Petitioner].  The court further reasonably
4    observed that such fabrication would result in no real consequence to Mendoza
     because of the latter's numerous pending criminal charges.

5          The trial court's ruling on such a motion rests so completely within its
     discretion that its action will not be disturbed unless a manifest and unmistakable
6    abuse of discretion clearly appears.  (*People v. Musselwhite* (1998) 17 Cal.4th
     1216, 1251-1252.)  No such abuse of discretion occurred in the instant case and
7    the trial court properly denied the motion for new trial on the ground of newly
     discovered evidence.

8

9    (Lodged Doc. No. 4, Opinion, at 41-43.)

10         Respondent initially argues that the instant claim does not raise a cognizable

11   constitutional claim under section 2254.  The Court agrees.  Petitioner does not point to and there

12   is no clearly established Supreme Court precedent that allows relief for a federal habeas

13   petitioner based on the state's denial of a new trial.   The existence of newly discovered evidence

14   in support of a claim of actual innocence does not constitutionally entitle a conviction person to a

15   new trial absent some independent underlying constitutional claim.  Herrera v. Collins, 506 U.S.

16   390, 404-405 (1993).  Other than Petitioner's claim that the trial court erred in denying his

17   motion for a new trial, he fails to present an independent underlying constitutional violation.  Nor

18   does Petitioner demonstrate a claim of actual innocence.  The state appellate court's decision

19   upholding the trial court's ruling on his motion for new trial based upon Mendoza's testimony

20   was neither contrary to nor an unreasonable application of federal law.  28 U.S.C. § 2254(d)(1).

21         Even if Petitioner has stated a cognizable federal claim, as fully discussed by the

22   California Court of Appeal, the trial court did not err in denying his motion for a new trial based

23   on Mendoza's testimony.  "Under California law, a new trial will be granted if: (1) the evidence

24   is newly discovered; (2) the evidence is not cumulative; (3) the evidence is 'such as to render a

25   different result probable on a retrial of the cause;' (4) 'the party could not with reasonable

26   diligence have discovered and produced it at the trial;' and (5) that the 'facts be shown by the

27   best evidence of which the case admits."  Earp v. Ornoski, 431 F.3d 1158, 1171 n.10 (9th Cir.

28   2005) (quoting People v. Martinez, 36 Cal.3d 816, 821 (1984)).  The state appellate court

properly found, after reviewing the totality of the new evidence, that Mendoza was not credible, based on the content of his testimony, the "burly" manner of its delivery, his gang-affiliated motive to life, and low risk exposure due to pending criminal charges.  "Title 28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  Knaubert v. Goldsmith, 791 F.2d 722, 727 (9th Cir. 1986) (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983).  The state court judge who presided over Petitioner's trial held an evidentiary hearing and made the specific finding that Mendoza was not credible.  Accordingly, Petitioner has failed to demonstrate that the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

G.      Ineffective Assistance of Appellate Counsel

Petitioner claims that appellate counsel provided ineffective assistance for failing to present grounds three and five, and ground four as a federal issue, on direct appeal.  The California Supreme Court summarily denied the claim.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); See also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on appeal.  Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence

in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. Id.  Appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by petitioner. Id at 1434 n.10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

Petitioner's claim is without merit.  In ground three (discussed infra, Section E), Petitioner raised three separate instances of ineffective assistance of trial counsel, which were not raised on direct appeal.  Because there is no merit or entitlement to relief on Petitioner's ineffective assistance of counsel or cumulative error claims, appellate counsel could not have been ineffective for failing to raise them on direct appeal.  In addition, the fact that appellate counsel failed to present ground four-third party culpability-as a federal claim in state court is irrelevant given that it was addressed and rejected by this Court.  Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

H.   Cumulative Error

Petitioner contends that the cumulative effect of trial errors in grounds one through four resulted in a trial that was fundamentally unfair resulting in a denial of his due process rights. Petitioner presented this claim in a petition for writ of habeas corpus to the California Supreme Court, which denied it.

The United States Supreme Court has not recognized a claim of cumulative error to grant relief pursuant to a habeas corpus petition.  See Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002) ("Supreme Court has not held that distinct constitutional claims can be cumulated to grant

1   habeas relief.")  Although the Ninth Circuit recognizes such a claim,[3] in the instant case as

2   discussed herein, because there was no reversible error, Petitioner is not entitled to habeas corpus

3   relief on his claim of cumulative error.  See United States v. Carreno, 363 F.3d 883, 889 n.2 (9th

4   Cir. 2004) (noting that the cumulative error doctrine does not apply where there was no error);

5   Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there

6   can be no cumulative error).  Consequently, Petitioner's claim fails.

7                                    RECOMMENDATION

8           Based on the foregoing, it is HEREBY RECOMMENDED that:

9           1.      The instant petition for writ of habeas corpus be DENIED; and,

10          2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

11          This Findings and Recommendation is submitted to the assigned United States District

12   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

13   the Local Rules of Practice for the United States District Court, Eastern District of California.

14   Within thirty (30) days after being served with a copy, any party may file written objections with

15   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

16   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

17   and filed within ten (10) court days (plus three days if served by mail) after service of the

18   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

19   636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

20   may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

21   Cir. 1991).

22          IT IS SO ORDERED.

23   Dated:    September 16, 2009          _____/s/ Dennis L. Beck_____
                                            UNITED STATES MAGISTRATE JUDGE
24

25

26   _____

27       [3]  Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000) (recognizing cumulative error standard but
     relief granted based upon single error); see also Daniels v. Woodford, 428 F.3d 1181, 1214 (9th Cir. 2005) (granting
     relief based on cumulative error); Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002) (rejecting cumulative error
28   claim as meritless); Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2001) (granting relief based on cumulative
     error), overruled on other grounds, Payton v. Woodford, 229 F.3d 815, 828 n.11 (9th Cir. 2002).